**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JAMES N. THOMAS,**

      **Plaintiff,**

**v.**                                       **Case No.: 3:10-cv-01210**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

      **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATIONS</u>**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. This case was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). This case is presently before the Court on the parties' cross motions for judgment on the pleadings as articulated in their supporting briefs. (Docket Nos. 10 and 13).

The undersigned has fully considered the evidence and the arguments of counsel.  For the reasons that follow, the undersigned proposes and recommends that the United States District Judge find that the decision of the Commissioner is not supported by substantial evidence and should be remanded for further

proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.      Procedural History

Plaintiff, James N. Thomas (hereinafter "Claimant"), applied for DIB benefits on February 23, 2007, alleging disability beginning August 15, 2005 due to rheumatoid arthritis.[1] (Tr. at 94, 115). The application was denied initially and upon reconsideration. (Tr. at 13). Thereafter, Claimant requested an administrative hearing, which was held on October 8, 2008 before the Honorable Michelle D. Cavadi, Administrative Law Judge (hereinafter the "ALJ"). (Tr. at 25-46). By decision dated July 27, 2009, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 13-20).

The ALJ's decision became the final decision of the Commissioner on August 21, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3). Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties have filed their Briefs in Support of Judgment on the Pleadings. Therefore, this matter is ready for disposition.

## II.     Summary of the ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability.  See *Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial

---

[1] Rheumatoid arthritis ("RA") is a long-term, often progressive disease that leads to inflammation of the joints and surrounding tissues.  RA generally affects both sides of the body equally and causes joint pain, stiffness, and ultimately decreased range of motion.  There is no test that can determine with certainty whether a patient has RA; however, a rheumatoid factor test may help in making the diagnosis. *See* National Library of Medicine, National Institutes of Health at www.ncbi.nlm.nih.gov/pubmedhealth.

gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims.  If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied.  20 C.F.R. § 404.1520.  The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b).  If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c).  If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d).  If the impairment does, then the claimant is found disabled and awarded benefits. However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e).  After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f).  If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and

mental capacities, age, education, and prior work experiences. *Id.* § 404.1520(g); see also *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined, as a preliminary matter, that Claimant met the insured status requirements of the Social Security Act through December 31, 2008. (Tr. at 15, Finding No. 1). The ALJ found that Claimant satisfied the first step of the sequential evaluation, because he had not engaged in substantial gainful activity since the alleged disability onset date; that being, August 15, 2005. (*Id.,* Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of irritable bowel syndrome, cervical spondylosis, and rheumatoid arthritis. (*Id.,* Finding No. 3). At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment included in the Listing. (Tr. at 16, Finding No. 4). The ALJ then found that Claimant had the residual functional capacity to:

> [P]erform the exertional demands of medium work, or work which requires maximum lifting of 50 pounds, frequent lifting of up to 25 pounds, and standing or walking approximately 6 hours of an 8 hour day and sitting up to 6 hours in an 8-hour day. The claimant should climb no ropes, ladders, or scaffolds and avoid concentrated exposure to extreme cold, heat, wetness, humidity, noise, fumes, odors, dusts, gases, and hazards.

(*Id.*, Finding No. 5).

Using this RFC assessment, a vocational expert testified that Claimant could

return to his past relevant employment as an inventory clerk and parimutuel teller at a race track in the manner that those jobs had actually been performed by Claimant. (Tr. at 20, Finding No. 6).   On this basis, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act.  (Tr. at 17, Finding No. 11).

### III.   Scope of Review

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is based upon the correct application of the law and is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F. 3d 650, 653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d585, 589 (4th Cir. 2001). The Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). As such, the Court will not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. *Id.*  The Court's obligation is to "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is whether the decision of

the Commissioner is well-grounded, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## IV.   <u>Claimant's Background</u>

Claimant was born in 1949 and was 59 years old at the time of his administrative hearing. (Tr. at 29). He earned a high school diploma and attended college for approximately two years.  He could speak and read English and perform simple mathematics. (Tr. at 30). In the years preceding his alleged onset of disability, Claimant was employed as an inventory manager, parimutuel teller at a greyhound racing track, a maintenance worker, and a self-employed contractor doing home improvement. (Tr. at 25-26).

## V.   <u>Relevant Medical Evidence</u>

The undersigned has carefully reviewed the Transcript of Proceedings and summarizes the relevant medical evidence as follows.

### A.   **Treatment Records**

On October 2, 2003, Claimant consulted with Dr. David Revell for pain in the arms, knees, elbows, shoulders, neck, and back that had persisted for fifteen years and was getting worse. (Tr. at 282). Claimant attributed his symptoms to Lyme Disease, which he allegedly contracted in the late 1980's. He also admitted to drinking "a lot" of beer, indicating that he had started drinking at age 13. (*Id.*).  Dr. Revell ordered routine blood work, prescribed Celebrex and instructed Claimant to reduce his alcohol intake. At a follow-up visit on October 16, 2003, Claimant reported feeling much better, but by his next visit on November 6, 2003, he stated

that he was "much worse" and "hurt all over."  (Tr. at 280-281).  Claimant indicated that he was unable to work due to the pain. Dr. Revell documented that Claimant was walking and moving stiffly, but did not have evidence of acute synovitis.[2] Accordingly, Dr. Revell added Lortab and Plaquenil, a medication used to treat rheumatoid arthritis, to Claimant's medication regimen. (Tr. at 280-81). On November 20, 2003, Claimant reported that Plaquenil helped "a lot."  (Tr. at 279). However, on December 18, 2003, at a follow-up visit with Dr. Revell, Claimant complained that he was in awful shape and was "stiff all over."  (Tr. at 278).

The next record of medical care is dated January 4, 2007 and documents Claimant's initial visit with Dr. Stephen Campbell, a primary care physician practicing in Barboursville, West Virginia. (Tr. 201-202). Claimant told Dr. Campbell that he had pain in his spine, legs, and hips that had been present for years.  In the past, working and physical activity helped to decrease the pain, but it "now just gets worse as the day goes on."  (*Id.*).  He reported a lengthy history of excessive alcohol use; however, he expressed no desire to quit drinking.  He advised that alcohol helped control his longstanding problem of resting tremors. After performing a physical examination, Dr. Campbell diagnosed Claimant with arthralgia;[3] chronic generalized pain disorder; alcohol abuse; tobacco abuse; hyperlipidemia; and hypersensitivity dermatitis.  (*Id.*).  Dr. Campbell ordered a series of blood tests, injections of B-12 and Depo Medrol; and oral doses of Darvocet

---

[2] Synovitis is an inflammation of the synovial membrane of a joint.  Fluid accumulates around the capsule and the joint becomes tender, swollen, and painful, restricting motion.  In most cases, the inflammation subsides and the fluid is reabsorbed without medical or surgical intervention.  *Mosby's Medical Dictionary,* 8th edition. 2009, Elsevier.

[3] Arthralgia is a general term for joint pain.  *Mosby's Medical Dictionary,* 8th edition. 2009, Elsevier.

and Klonopin for pain.

Claimant returned to Dr. Campbell on January 10, 2007 to discuss the results of his laboratory studies. (Tr. at 200). Dr. Campbell advised Claimant that he had hyperlipidemia and required medication to reduce his LDL level.  In addition, Dr. Campbell discussed Claimant's significantly elevated rheumatoid factor of 280,[4] suggesting that he try medication to manage the condition before referring Claimant to a rheumatologist.

On January 29, 2007, Claimant presented to Dr. Campbell seeking a change in his Darvocet prescription.  (Tr. at 199).  He complained that the medication upset his stomach and caused reflux symptoms.   Claimant was continuing to take Plaquenil for his rheumatoid arthritis and was prescribed Prevacid for reflux and Lyrica for pain.  (*Id.*).

Claimant saw Dr. Campbell for the last time on March 13, 2007.  (Tr. at 198). Claimant came, in part, for an examination and, in part, to seek Dr. Campbell's assistance in filling out disability forms.  Dr. Campbell documented in his record that he spent 45 minutes completing the forms, including taking Claimant's history, reviewing his past medical care, obtaining vital signs and performing a musculoskeletal, neurological, cardiovascular, and respiratory examination of Claimant.  In the five page disability form, Dr. Campbell noted that Claimant had an abnormal gait, describing it as "deliberate with obvious pain," and abnormal joints, which had a full range of motion but were uniformly tender. (Tr. at 194). Dr. Campbell also indicated that Claimant had shortness of breath on exertion.   He diagnosed Claimant with rheumatoid arthritis, alcohol abuse, tobacco abuse,

---

[4] A normal level according to the laboratory's reference range is between 0-14.  (Tr. at 206).

keratosis of both flanks, and gastroesophageal reflux disease ("GERD"). In response to a question regarding Claimant's ability to do work related activities, Dr. Campbell wrote, "[Patient] is severely limited in what he can perform." (Tr. at 197).

On September 20, 2007, Claimant had his first, and apparently only, office visit with Dr. John M. Clark. (Tr. at 293). Claimant complained of pain and decreased range of motion with difficulty getting up and down. He stated that his hips were especially bothersome. (*Id.*). According to Claimant, all of his joints hurt requiring him to stay in bed most of the day. He also had swelling of the elbows and small joints of his hands. He reported having seen a rheumatologist a week earlier, who recommended the medications Enbrel and Humera, but Claimant could not afford the $200 co-pay, so he had not started them. Dr. Clark diagnosed rheumatoid arthritis and elevated blood pressure. He referred Claimant to Dr. Leah Triplett at Mountain State Medicine and Rheumatology, PLLC for evaluation, but the record does not contain evidence that Claimant kept the referral. (Tr. at 294-95).

On January 16, 2008, Claimant initiated treatment with Dr. Jason Hudak. (Tr. at 239). Claimant told Dr. Hudak that he had a history of lupus and suffered from diffuse large and small joint pain. On physical examination, Dr. Hudak described Claimant as "well-appearing" with essentially normal findings. (Tr. at 239-240). Dr. Hudak ordered some screening laboratory tests and planned to obtain Claimant's prior medical records for review. He diagnosed abdominal pain, esophageal reflux, hyperlipidemia, and osteoarthritis. He commented that Claimant's osteoarthritis was stable on his current medication regimen and noted that Claimant did "not clinically appear to have RA." (Tr. at 241-42).

Claimant returned to Dr. Hudak's office on February 8, 2008.  (Tr. at 243-245).   His primary complaint was persistent diarrhea. He had no complaints of systemic symptoms or musculoskeletal pain and stiffness. Once again, Dr. Hudak described Claimant as "well-appearing." He prescribed medication for Claimant's abdominal symptoms and ordered some outpatient testing, indicating that Claimant might have irritable bowel syndrome. Claimant's osteoarthritis was noted to be stable with medication. (Tr. at 245). By Claimant's next office visit, his abdominal symptoms had decreased with medication use.  (Tr. at 247).  Dr. Hudak reached a presumptive diagnosis of irritable bowel syndrome ("IBS") and discussed with Claimant the possibility of a referral to a gastroenterologist.  (*Id.*).

On March 14, 2008, Claimant presented to Dr. Hudak in follow-up of his IBS. (Tr. at 249-51).  Claimant reported improvement with continued use of medications and had no other complaints. Dr. Hudak's physical examination of Claimant revealed no significant findings. (*Id.*). Claimant's condition remained stable on his next visit with Dr. Hudak in April 2008.  (Tr. at 252-54).

Claimant returned to Dr. Hudak on July 18, 2008.  (Tr. at 255-58).  On this visit, Claimant complained of arthritic pain, particularly at night, which affected his sleep. He described pain and stiffness in his joints that increased when he sat or stood for extended periods and when he flexed or extended. Dr. Hudak diagnosed cervical spondylosis[5] and wrote a prescription for a pain reliever to control Claimant's nightly symptoms. On this same date, Dr. Hudak completed a Medical Assessment of Ability To Do Work-Related Activities (Physical) form.  (Tr. at 272-

_____

[5] Cervical spondylosis is a condition of the spine at the level of the neck characterized by stiffness and fixation of the joints.  *Mosby's Medical Dictionary*, 8th edition. 2009, Elsevier.

275).  He opined that Claimant could not lift or carry more than 5 pounds due to his limited strength and range of motion related to spondylosis. He also indicated that Claimant could not sit more than two hours during an 8-hour work day and no more than two hours without interruption.   Dr. Hudak felt that Claimant's only environmental limitation related to avoiding heights, but found Claimant limited in all postural activities; particularly, climbing and crawling.  He noted that Claimant had markedly decreased strength and endurance in his upper extremities and a limited range of motion.  (*Id.*).

The medical evidence contains one final treatment record dated August 28, 2008, which documents Claimant's next visit with Dr. Hudak.  (Tr. at 259-61).  On this visit, Claimant advised Dr. Hudak that he was generally doing well and his pain was stable, although he was experiencing leg and foot cramps that had worsened over the past week. Dr. Hudak counseled Claimant on the proper use of his medication and their possible side effects and advised him to return in one month. (*Id.*).

**B.    Agency Assessments**

During the period between Claimant's treatment with Dr. Campbell and his treatment with Dr. Hudak, the SSA arranged for one physical examination of Claimant performed by Dr. Kip Beard and requested two Physical Residual Functional Capacity Assessments from agency consultants; one from Dr. Porfirio Pascasio and one from Dr. Rogelio Lim.  (Tr. at 210-14, 218-25, 227-34).

Dr. Beard examined Claimant on March 26, 2007.  (Tr. at 210-214).  He noted that Claimant was diagnosed with rheumatoid arthritis in 1988 by a physician in Texas. Claimant described chronic pain involving his hands, wrists, elbows, both

knees, and his neck.  He denied a history of orthopedic surgery or treatment by joint injections or aspirations.  He explained that his condition was treated with Plaquenil, but admitted that he had ceased using that drug, because it caused him to suffer nausea and vomiting. Instead, he relied upon pain medication to relieve his symptoms.  According to Claimant, he could "barely do anything" without his pain medications. (*Id.*).

On physical examination, Dr. Beard observed that Claimant used no ambulatory aids or assistive devices.  Claimant ambulated with a very stiff appearing posture, but had no limp.  He was able to stand unassisted, rise from a seat, and step up and down from the examination table without difficulty.  Claimant complained of pain and stiffness in his neck and shoulder on range of motion testing; however, he had no spasms, redness, warmth, swelling or obvious crepitus.  He also complained of mild pain in his wrists and elbows, but his neurological examination was normal revealing no muscle wasting, weakness, or loss of sensation. (Tr. at 212-213). Dr. Beard added that Claimant had no evidence of synovitis or synovial thickening or bony abnormalities. (Tr. at 214*)*. Dr. Beard diagnosed Claimant with chronic arthralgias, including osteoarthritis and reported rheumatoid arthritis, and chronic cervical strain with possible cervical degenerative disk disease and spondylosis. (*Id.*).

Dr. Porfirio Pascasio completed a physical RFC assessment on April 2, 2007. (Tr. at 218-225).  He opined that Claimant could occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; stand, walk, or sit up to 6 hours, each, out of an 8-hour work day; and had an unlimited capability to push and pull.  (Tr. at 219).  Dr. Pascasio found no evidence of postural, manipulative, visual,

communicative, or environmental limitations.  (Tr. at 220-222).  He felt Claimant was only partially credible when describing his symptoms.  (Tr. at 223).

Dr. Rogelio Lim provided his RFC assessment of Claimant on July 16, 2007. (Tr. at 227-234).  His findings mirrored those of Dr. Porfirio, with the exception that Dr. Lim felt Claimant should avoid concentrated exposure to vibrations.  (*Id.*).  He also believed Claimant was only partially credible in his statements about the intensity, persistence, and severity of his symptoms.

## VI.   **Claimant's Challenges to the Commissioner's Decision**

Claimant challenges the decision of the Commissioner on two grounds: (1) the ALJ unfairly assessed Claimant's subjective complaints of pain, rejecting them without proper explanation and (2) the ALJ "failed to mention, much less discuss, the assessment of Plaintiff's treating doctor, Dr. Stephen Campbell."  (Pl. Br. at 10).

In response, the Commissioner asserts that the ALJ thoroughly explained his reasons for finding Claimant's subjective complaints to be less than fully credible and likewise provided a comprehensive review of Dr. Campbell's treatment records. The Commissioner argues that the ALJ's decision is supported by substantial evidence and should be affirmed.

## VII.   **Analysis**

After a thorough review of the record, the undersigned finds that the ALJ conducted an acceptable assessment of Claimant's credibility.  Although the ALJ's explanation for discounting Claimant's allegations of disabling pain is not robust, the ALJ provided sufficient rationale for her conclusions.  Therefore, this challenge lacks merit.

However, the undersigned agrees with Claimant that the ALJ wholly failed to address a treating source opinion that Claimant was severely limited in his ability to perform work related activities; for that reason, the undersigned is unable to conclude that the ALJ's decision is supported by substantial evidence. Inasmuch as this decision became the final decision of the Commissioner, the undersigned respectfully recommends that the presiding District Judge remand the case for further analysis of the medical source opinions pursuant to sentence four of 42 U.S.C. § 405(g).

### A.  Credibility Assessment

Social Security Ruling 96-7p explains the two-step process by which the ALJ must evaluate symptoms, including pain, pursuant to 20 C.F.R. §§ 404.1529 in order to determine their limiting effects on a claimant. First, the ALJ must establish that the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the alleged symptoms, including pain. SSR 96-7P. Once the ALJ finds that the conditions could be expected to produce the symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of statements made by the claimant to support the alleged disabling effects. The Ruling sets forth the factors that the ALJ must consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. The Ruling further directs that the credibility determination must be based on a consideration of all of the evidence in

the case record.  *Id.*

When evaluating whether an ALJ's credibility determination is supported by substantial evidence, the Court must not substitute its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusion. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence . . . or substitute its own judgment for that of the Commissioner." *See Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976).

Here, the ALJ acknowledged that Claimant's medically determinable medical impairments could be expected to produce pain. Turning to the second step of the process, the ALJ summarized the medical records in evidence and the testimony of Claimant, concluding that Claimant's statements were not fully credible, because they were inconsistent with the objective medical findings, the ALJ's observations of Claimant, and the Claimant's self-described daily activities. (Tr. at 19). The ALJ pointed out that Claimant alleged crippling arthritis, but walked without ambulatory aids, used no assistive devices, had normal hand grip and strength, and did not have the external findings commonly seen in extreme cases of arthritis. Although Claimant maintained that arthritis prevented him from sitting, standing, and walking, he admitted to grocery shopping, reading, watching television, and attending physician appointments.  (Tr. at 17).  Moreover, Claimant conceded that medication relieved his musculoskeletal pain, as well as his symptoms of irritable

bowel syndrome. His symptoms were recorded to be stable and he was noted to be "well-appearing" and "doing well" at his last office visit with his primary care physician. (Tr. at 19-20).

The record substantiates the ALJ's determination. The medical records reflect extended periods of time during which Claimant's symptoms were described as mild or transient. He never required surgical treatment, joint injections or aspirations, braces, prescribed ambulatory aids, assistive devices, or physical therapy. Dr. Beard commented on Claimant's ability to sit, stand, and walk without assistance. He was able to walk on his heels and toes, walk heel-to-toe, and squat three quarters of the way. (Tr. at 214). Although he undoubtedly had joint tenderness, none of the treating or examining physicians described synovitis; synovial thickening; warmth; swelling; crepitus; deformity; significantly decreased range of motion; muscle wasting; neurological impairment, or other findings indicative of advanced rheumatoid arthritis. The records of Dr. Hudak, Claimant's primary care physician at the time of the administrative hearing, confirm the absence of neck pain, stiffness, or swelling despite a diagnosis of cervical spondylosis. At his last visit with Claimant, Dr. Hudak described Claimant as "well-appearing" and documented that Claimant's pain was stable and he reported doing well. (Tr. at 259). Although Claimant argues that the ALJ took these notations out of context, the records are replete with similar entries. The Court is not charged with re-weighing the evidence or resolving conflicts in the record. Instead, the Court reviews the conclusions of the ALJ "to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Using this standard of review, the undersigned finds substantial evidence in the record to

support the ALJ's credibility determination.

### B.    Treating Source Opinion

Claimant posits that the ALJ failed to address in any manner the opinion of Dr. Stephen Campbell regarding Claimant's ability to do work related activities. Claimant argues that this failure was a direct contravention of the SSA's own regulations and, as a result, the Commissioner's final decision is not supported by substantial evidence.[6]  The Commissioner disputes the factual premise of Claimant's contention, identifying sections of the ALJ's decision in which she expressly discussed Dr. Campbell's records.[7]  While it is true that the ALJ explicitly relied upon some of Dr. Campbell's medical findings in reaching her decision, it is likewise true that the ALJ did not consider or weigh Dr. Campbell's medical source opinion on Claimant's ability to do work related activities.

---

[6] The Commissioner concedes that Dr. Campbell is a treating medical source. (Def. Br. at 11).

[7] In the written decision, the ALJ mistakenly identifies Claimant's treating physician as Dr. Timothy Saxe. However, the ALJ does refer to Dr. Campbell's records. The Commissioner explains as follows:

> [The ALJ] cited to and thoroughly discussed treatment records from Plaintiff's primary care provider, Dr. Stephen Campbell, which support the ALJ's decision . . . the ALJ understandably attributed Dr. Campbell's records to his partner, Dr. Saxe.  The record clearly shows that Dr. Campbell maintains an internal medicine practice with Dr. Saxe.  In fact, Dr. Campbell's treatment records are identified on the second page of the Court Transcript Index as having been received from Dr. Saxe, the state agency's request for Plaintiff's medical records was addressed to Dr. Saxe, and the routine abstract form identified Dr. Saxe as the treating source.  As a result, the ALJ attributed Plaintiff's brief history of treatment with Dr. Campbell to his partner, Dr. Saxe.  Nevertheless contrary to Plaintiff's allegation that "the ALJ failed to mention, much less discuss, the assessment of Plaintiff's previous treating doctor," it is patently obvious that the ALJ thoroughly discussed Dr. Campbell's treatment records.  Although the ALJ understandably referred to Dr. Saxe as the treating physician, the relevant fact is that she did not fail to assess the treatment records from Dr. Campbell.  (transcript citations omitted).  (Def. Br. at 11-12).

On March 13, 2007, Dr. Campbell completed a five page form sent by the Disability Determination Section ("DDS"), seeking information from a "treating source" regarding Claimant's allegations; signs, symptoms, and findings; medications; and diagnoses.  The final page of the form requested a "medical source statement" about Claimant's ability to do work related activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking and traveling.  (Tr. at 197). In response to that query, Dr. Campbell opined that Claimant was "severely limited in what he can perform," without further elaboration.  (Tr. at 197).

20 C.F.R. § 404.1527, which explains how opinion evidence will be considered and weighed in determining whether a claimant qualifies for disability benefits, states that the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [she] receives." *Id* § 404.1527(b).  Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions."  *Id* § 404.1527(a)(2). If medical opinions are inconsistent, either internally or with other opinions or evidence in the record, the ALJ will weigh the evidence, including the medical opinions, to determine whether a decision can be made on the Claimant's alleged disability using only the information in the record. If not, the ALJ takes additional steps to resolve the inconsistencies or supplement the evidence, including, for example, requesting additional records, recontacting treating sources, or asking the claimant to undergo a consultative

examination. *Id* § 404.1527(c). In weighing medical source opinions, the ALJ is expected to use a hierarchical system.  In general, the ALJ will give more weight to the opinion of an examining medical source than to the opinion of a non-examining source.  *See* 20 C.F.R. § 404.1527(d)(1).  Even greater weight is allocated to the opinion of a treating source, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  *See* 20 C.F.R. § 404.1527(d)(2). "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight." SSR 96-7p. Nonetheless, the opinion of a treating physician is only afforded "controlling weight" if two conditions are met: "(1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. § 404.1527(d)(2).

If the ALJ determines that a treating physician's opinion should not be considered controlling, the ALJ must then analyze and weigh all of the medical opinions of record, taking into account the factors listed in 20 C.F.R. § 404.1527(d)(2)-(6), which are (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. "A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected.  It may still be entitled to deference and be adopted by the adjudicator."   SSR 96-2p.   Ultimately, it is the responsibility of the Commissioner, not the court, to evaluate the case, make findings of fact, and resolve conflicts of evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  The

regulation adds that the SSA "**will always give good reasons** in our notice of determination or decision for the weight we give your treating source's opinion." *Id.* § 404.1527(d)(2) (emphasis added).

Similarly, in determining an individual's RFC, the ALJ "must always consider and address medical source opinions" about a claimant's functional limitations and must weigh these opinions, "providing appropriate explanations for accepting or rejecting" them. 20 C.F.R. § 404.1527. "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p at 6; *Diaz v. Chater,* 55 F.3d 300 (7th Cir. 1995), "[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater,* 79 F.3d 1007, 1009 (10th Cir. 1996), citing *Vincent ex rel. Vincent v. Heckler,* 739 F.2d.1393 (9th Cir. 1984). "A minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984). Simply stated, the SSA's regulations require the ALJ to consider all medical source opinions, to allocate weight to opinions that are in conflict, to resolve inconsistencies in the evidence, and to articulate a reasonable basis for the ultimate resolution. Each of these duties is accorded similar importance under the regulations.

The Supreme Court has recognized as a fundamental principle of administrative law that agencies are obligated to follow their own regulations. *American Farm Lines v. Black Ball Freight Service, et al.,* 397 U.S. 532 (1970).

Nevertheless, courts have applied a harmless error analysis to administrative decisions that do not fully comport with the procedural requirements of the agency's regulations, but for which remand "would be merely a waste of time and money." *Jenkins v. Astrue,* 2009 WL 1010870 at *4 (D. Kan. 2009), citing *Kerner v. Celebrezze,* 340 F.2d 736, 740 (2nd Cir. 1965). In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir. 1983). Thus, under this analysis when reviewing a challenge based upon the failure of an agency to follow its regulations, the reviewing court assesses whether the regulations were in fact disregarded and, if so, whether that error was harmless. This circuit has employed the harmless error analysis in the context of Social Security disability determinations. *See Morgan v. Barnhart,* 142 Fed. Appx. 716, 722-23 (4th Cir. 2005)(unpublished); *Bishop v. Barnhart,* 78 Fed. Appx. 265, 268 (4th Cir. 2003)(unpublished). In these cases, harmless error exists when "it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record." *Spiva v. Astrue,* 628 F.3d 346, 353 (7th Cir. 2010). The court does not demand procedural perfection and may affirm an imperfect decision if it is supported by substantial evidence, provides an adequate explanation of the decision-making analysis, and contains only harmless errors. *See, e.g. Morris v. Bowen,* 864 F.2d 333, 335 (5th Cir. 1988)("Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected."); *See, also, Fisher v. Bowen,* 869

F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").[8]  Accordingly, *de minimis* violations of the procedural requirement of § 1527(d)(2) to "give good reasons" for the weight alloted to a treating source's opinion do not require remand; for example, when the treating source opinion is so "patently deficient that the Commissioner could not possibly credit it," or the Commissioner has adopted or made findings consistent with the opinion, making explanation of the weight irrelevant.  *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 547 (6th Cir. 2004); *See also Knox v. Astrue,* 2011 WL 861713 *11 (N.D. Ohio).[9]  However, where the medical statements of record contain radically different opinions, the absence of explicit confirmation that the ALJ considered and weighed each opinion and resolved the conflicts inevitably suggests that a different decision might well have been reached if the ALJ had meticulously complied with the agency's regulations. *See Nyberg v. Commissioner of Social Security,* 179 Fed. Appx. 589, 592 (11th Cir. 2006)(unpublished)(failure to address conflicting opinion by a treating source cannot be deemed harmless without "re-weighing the evidence and engaging in conjecture that invades the province of the ALJ").

---

[8] The United States Court of Appeals for the Fourth Circuit, in a number of unpublished decisions, has taken the same approach.  *See, e.g., Bishop v. Barnhart, supra*; *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, at *1 (4th Cir. Jan. 31, 1996).

[9] In *Knox,* the District Court found a treating source's opinion to be patently deficient, because it was nothing more than a three sentence conclusion without any objective diagnostic basis or "direct support from the other medical evidence."  *Knox v. Astrue, supra* at *12.

Here, the ALJ's oversight of Dr. Campbell's medical source statement cannot be viewed as harmless; particularly, in light of the RFC determination, which is directly at odds with Dr. Campbell's opinion, and the ALJ's rejection of a similar opinion expressed by Claimant's other primary care physician, Dr. Hudak. When explaining her reasons for giving less than determinative weight to Dr. Hudak's opinion, the ALJ emphasized that Dr. Hudak appeared to base his conclusions "solely on the claimant's subjective allegations" and that he "started treating the claimant on January 16, 2008, and would have no knowledge of his condition prior to that date." (Tr. at 19). In contrast, Dr. Campbell did have knowledge of Claimant's condition prior to January 2008 and expressly based his opinion on Claimant's history, physical examination, diagnoses, and medications as they presented on the date of the disability examination. Accordingly, at least some of the weaknesses identified by the ALJ when discounting Dr. Hudak's opinion do not exist in Dr. Campbell's opinion.  In any event, Dr Campbell is a treating source; consequently, his opinion is entitled to controlling weight or, in the alternative, to be apportioned a reasonable weight unambiguously determined in view of the factors contained in 20 C.F.R. § 404.1527(d)(2). The undersigned acknowledges that Dr. Campbell's medical source opinion is conclusory and somewhat difficult to reconcile with his detailed physical findings. However, inasmuch as the opinion is based upon objective diagnostic data obtained through contemporaneous physical examination, it is not patently deficient.  In addition, the form[10] arguably contributed to the

---

[10] The form states as follows:  Medical Source Statement—Please include a statement, based on your medical findings, about this claimant's ability, despite any functional limitations imposed by his/her impairment(s) to do work related activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling.

conclusory nature of the opinion by asking for "a statement" rather than requesting specific findings on a function by function basis.  At a minimum, the ALJ should have expressly weighed Dr. Campbell's opinion and provided a simple explanation for either accepting or rejecting it.  Better yet, the ALJ could have exercised other options available to her, such as recontacting Dr. Campbell to request more information regarding his opinion about the extent of Claimant's limitations in the standard categories of exertional and nonexertional functions.

Moreover, the ALJ failed to identify the particular opinions of the agency consultants which she adopted or rejected and further failed to explain the reasons for adopting or rejecting them, stating only "[t]he Administrative Law Judge mostly concurs with the findings of the Disability Determination Services (DDS) consultants.  In sum, the above residual functional capacity assessment is supported by objective evidence and expert opinions."[11] (Tr. at 20).  These elusive and conclusory statements do not provide "good reasons" for the apparent allocation of weight given by the ALJ to the medical source opinions. Title 20 C.F.R. § 404.1527(f)(2) requires the ALJ to consider the opinions of agency medical consultants under the same factors used to evaluate any other medical source opinion. RFC assessments prepared by agency consultants "are to be considered and addressed in the decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s)." SSR 96-6p.

---

[11] For example, after "mostly" concurring with the agency consultants, the ALJ included in her RFC determination a postural limitation (climb no ropes, ladders, or scaffolds) and a laundry list of environmental limitations (avoid concentrated exposure to extreme cold, heat, wetness, humidity, noise, fumes, odors, dust, gases, and hazards) when neither consultant found these limitations to be applicable to Claimant.  (Tr. at 16, 220-22, 229-31). Conversely, the sole environmental limitation suggested by Dr. Rogelio Lim (avoid concentrated exposure to vibrations) was not included in the ALJ's RFC determination.  In fact, as none of the medical source opinions in Claimant's case file include the environmental limitations incorporated in the RFC determination of the ALJ, it is a mystery as to the expert foundation for these restrictions.

Unless the treating source opinion is given controlling weight, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for [the SSA]." 20 C.F.R. § 404.1527(f)(2)(ii).  This mandate plainly was not followed in the present case; as such, the court is left to speculate as to the basis of the ALJ's RFC determination. Re-examining the medical opinions, allocating their weight, and resolving conflicts in the evidence are not tasks within the scope of this Court's review.  Similarly, the Court will not supply a rationale for rejecting an opinion where the ALJ has supplied none. *Cf. Patterson v. Bowen,* 839 F.2d 221, 225 n. 1 (4th Cir. 1988) ("We must ... affirm the ALJ's decision only upon the reasons he gave."). By failing to adequately explain the weight that was given to probative medical opinions, the ALJ has made it impossible for the Court to determine whether the final decision was (1) reached after careful consideration of the totality of the evidence and (2) supported by substantial evidence.

Based on all of the above, the undersigned respectfully proposes that the District Judge **FIND** (1) that the ALJ failed to properly consider and weigh the medical source  opinions, and (2) that this failure mandates a further finding that the final decision of the Commissioner was not supported by substantial evidence. Finally, the undersigned proposes that the Court **FIND** that this matter should be remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**VIII.**     <u>**Recommendations for Disposition**</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** plaintiff's Motion for Judgment on the Pleadings (Docket No. 10), **DENY** defendant's Motion for Judgment on the Pleadings (Docket No. 13), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings, and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Plaintiff shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins,* 766 F.2d 841 (4th Cir. 1985); *United*

*States v. Schronce,* 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Faber and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to the Honorable David A. Faber and counsel of record.

**FILED:**  September 16, 2011.

Cheryl A.  Eifert
United States Magistrate Judge